UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **JOYCE SANDERS,** } | |
| } | |
| **Plaintiff,** } | |
| } | |
| v. } | Case No.: 2:11-cv-03711-MHH |
| } | |
| **STAFFMARK; AGC** } | |
| **AUTOMOTIVE ALABAMA, INC.,** } | |
| } | |
| **Defendants.** } | |

# SUMMARY JUDGMENT OPINION

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, defendant AGC Automotive Alabama, Inc. asks the Court to enter judgment as a matter of law in its favor on plaintiff Joyce Sanders's Title VII sexual harassment claim. (Doc. 17). Having reviewed the record, and with the benefit of oral argument,[1] the Court finds that Ms. Sanders's claim fails as a matter of law. AGC is entitled to summary judgment because Ms. Sanders has not presented evidence of a tangible employment action and because she did not promptly notify her employer of the harassing conduct at issue.

---

[1] The Court held a hearing on AGC's motion on June 11, 2014. A court reporter was present, and a transcript is available upon request.

## ANALYSIS

To establish a prima facie case for sexual harassment against AGC under Title VII, Ms. Sanders must demonstrate (1) that she belongs to a protected group; (2) that she was subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, or other conduct of a sexual nature; (3) that the harassment was based on her gender; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of her employment and create a discriminatorily abusive working environment; and (5) that a basis exists for holding AGC liable. *Guthrie v. Waffle House, Inc.*, 460 Fed. Appx. 803, 806 (11th Cir. 2012) (internal quotations omitted).  It is undisputed that Ms. Sanders belongs to a protected group and that she was subject to sexual advances based on her gender.  Ms. Sanders's claim against AGC fails because she has not met her high burden of demonstrating that the conduct at issue altered the terms and conditions of her employment and created an abusive work environment.

There are two ways in which sexual harassment may alter the terms and conditions of employment such that an employer may be held liable for an employee's sexual harassment of a co-employee.  The first involves a tangible employment action.  A tangible employment action occurs when:

> the employee's refusal to submit to a supervisor's sexual demands results in a tangible employment action being taken against her . . . An employer is liable under Title VII if it (even unknowingly) permits a supervisor to take a tangible employment action against an employee

2

because she refused to give in to his sexual overtures. That liability exists regardless of whether the employee took advantage of any employer-provided system for reporting harassment.

*Hulsey v. Pride Restaurants*, LLC, 367 F.3d 1238, 1245 (11th Cir. 2004).  A tangible employment action is "a significant hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  *Ellerth,* 524 U.S. at 761.  "A constructive discharge qualifies as an adverse employment action."  *Menzie v. Ann Taylor Retail, Inc.*, 549 Fed. Appx. 891, 894 (11th Cir. 2013) (citing *Durley v. APAC, Inc.*, 236 F.3d 651, 657 (11th Cir. 2000)).

Ms. Sanders has not demonstrated that she was subject to a tangible employment action.  At the time of the events giving rise to this action, Staffmark, a staffing agency, had placed Ms. Sanders at AGC as an associate.  (Doc. 19-1, p. 19; Doc. 19-10, p. 7).[2]  Ms. Sanders's job responsibilities included loading glass into a machine on production lines.  (Doc. 19-1, p. 19).  The Court assumes for purposes of this motion that Lee Ray was Ms. Sanders's supervisor at AGC.  It is undisputed that on October 23, 2010, Mr. Ray sent Ms. Sanders a text message of his penis.  Viewing the record in the light most favorable to Ms. Sanders, before he sent the text message, Mr. Ray also commented on as many as six occasions that

---

[2] Originally, Ms. Sanders sued Staffmark and AGC.  Ms. Sanders and Staffmark filed a joint stipulation of dismissal on June 24, 2013, and the Court dismissed Ms. Sanders's claims against Staffmark with prejudice.  (Docs. 49, 50).

Ms. Sanders has a "big butt"; he made one comment about the type of underwear that Ms. Sanders wears; he asked her one time if she "liked it big or small"; and he made Ms. Sanders feel as though she owed him something for allegedly preventing her from being laid off. (Doc. 19-2, p. 6).[3]  One day after Mr. Ray sent the text message of his penis, Ms. Sanders walked off her job in the middle of her shift. Before she left, she told Gary Reed, the AGC Team Leader on duty that day, "I quit, I just – I'm leaving, I don't want to be here anymore." (Doc. 19-2, p. 5).[4]

Later that evening, Ms. Sanders contacted Dana Fleming, her Staffmark Account Manager, and told Ms. Fleming that she had received a "disturbing" text message from someone on site at AGC and that she "wasn't going back anymore." (Doc. 19-2, p. 5). According to Ms. Sanders, Ms. Fleming told her to call back on Monday morning and Staffmark would try to find her another placement. (Doc. 19-2, p. 5). During a meeting with Ms. Fleming and Staffmark District Director

---

[3] In addition, viewing the record in the light most favorable to Ms. Sanders, AGC employee Terrance Harris put his hands in her back pockets on one occasion. (Doc. 19-2, p. 1).

[4] Based upon evidence before it, the Court questions whether under *Vance v. Ball State Univ.*, 133 S. Ct. 2434 (2013), Ms. Sanders could establish that Mr. Ray qualifies as a supervisor such that she could take advantage of the tangible employment action theory. In *Vance,* the Supreme Court held that a supervisor is one whom "the employer has empowered ... to take tangible employment action against the victim, *i.e.,* to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 2443 (citation and internal quotation marks omitted). The record contains no evidence indicating that AGC empowered Mr. Ray to hire, fire, promote, or reassign AGC employees. Nevertheless, assuming Mr. Ray qualifies as a supervisor under *Vance*, as the Court does for purposes of this motion, Ms. Sanders cannot demonstrate that Mr. Ray or anyone else at AGC subjected her to an adverse employment action for her failure to comply with Mr. Ray's sexual advances.

Heather Healy, Ms. Sanders reiterated her wish for a different assignment. Ms. Sanders stated, "[I] just wanted another job, I just didn't want to be in that atmosphere." (Doc. 19-2, p. 7). Ms. Sanders has presented no evidence that Mr. Ray or any other supervisor at AGC terminated her employment.[5]

Likewise, Ms. Sanders has not established that she was constructively discharged. To establish a constructive discharge, a plaintiff must show that "working conditions were so intolerable that a reasonable person in her position would have been compelled to resign." *Poole v. Country Club of Columbus, Inc.*, 129 F.3d 551, 553 (11th Cir. 1997) (quotation marks omitted). "In evaluating constructive discharge claims, we do not consider the plaintiff's subjective feelings. Instead, we employ an objective standard." *Hipp v. Liberty Nat. Life Ins. Co.*, 252 F.3d 1208, 1231 (11th Cir. 2001) (citing *Doe v. Dekalb Cnty. Sch. Dist.,* 145 F.3d 1441, 1450 (11th Cir. 1998)). In *Menzie*, the Court explained that "[t]his objective

---

[5] Ms. Sanders submitted an affidavit in which she stated that she "wanted to go back to work at AGC," but she told Ms. Fleming and Ms. Healy that she wanted to be placed in a new job "because when they were interviewing me they acted like this was my only option." (Doc. 3-10, ¶ 14). This statement is not consistent with Ms. Sanders's deposition testimony. In her deposition, which preceded her affidavit, Ms. Sanders testified that she "wasn't going back" to AGC, that her Staffmark Account Manager "didn't blame [her] for not going back," and that the manager was willing to "try to find [Ms. Sanders] something else. (Doc. 19-2, p. 5). Further, when asked in an interview after she left AGC how she wanted the situated resolved, Ms. Sanders responded, "I just want another job and for someone to speak to Ray and tell him he can't be acting like that in the workplace." (Doc. 19-2, p. 182). In her affidavit, Ms. Sanders stated that Staffmark "acted like" a new assignment was her only option. Ms. Sanders cannot create an issue of fact on this point with her post-deposition affidavit. *See Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.,* 736 F.2d 656, 657 (11th Cir. 1984) ("When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.").

standard sets a high threshold; it requires a plaintiff to show harassment that is more severe or pervasive than the minimum level required to establish a hostile working environment. *Menzie*, 549 Fed. Appx. at 895 (internal citations omitted). The Court noted:

> We have "required pervasive conduct by employers before finding that ... a constructive discharge occurred." *Hipp,* 252 F.3d at 1231; *see also Bryant v. Jones,* 575 F.3d 1281, 1289–90, 1298–99 (11th Cir. 2009) (holding that plaintiff established constructive discharge claim with evidence that her employer "was abusive . . . on numerous occasions, including an interaction where he appeared ready to assault [the plaintiff] physically" and severely restricted the plaintiff's responsibilities); *Poole,* 129 F.3d at 553 (holding that plaintiff submitted sufficient evidence to establish constructive discharge claim when she was "[s]tripped of all responsibility, given only a chair and no desk, and isolated from conversations with other workers").

*Menzie*, 549 Fed. Appx. at 895.

Ms. Sanders's evidence does not meet the high standard required to establish a constructive discharge. Although the Court does not condone the conduct that caused Ms. Sanders to want to leave AGC, under Eleventh Circuit precedent, Ms. Sanders has not demonstrated a course of conduct so pervasive and intolerable that a reasonable person in Ms. Sanders's situation would have felt compelled to resign. *See e.g., Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 584-86 (11th Cir. 2000), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) (the following conduct was not severe and pervasive: alleged harasser stared at plaintiff, touched her ring and bracelet once, repeatedly asked her

to lunch, unbuckled his belt and pulled down his zipper and tucked in his shirt in plaintiff's presence, frequently called plaintiff's home and asked about her boyfriend); *Menzie*, 460 Fed. Appx. at 804-05, (finding the following harassment was not sufficiently severe or pervasive to alter the terms and conditions of employment: "On unspecified dates, Barnett grabbed Guthrie 'on my butt' two to five times; 'talked dirty' to Guthrie, including saying five times that he wanted to 'f[]' her and 'lick' her 'all over;' once spoke openly about having sex in another waitress's van in the restaurant's parking lot; and asked Guthrie on a date 10 to 20 times, which she always refused. Barnett said 15 times that Guthrie would not date him because he was black, and commented 10 times that God had created everyone equal. On September 3, 2008, Barnett said that Guthrie 'could just pee in his mouth,' after she stated that she was taking a restroom break. On September 24, 2008, Barnett approached Guthrie from behind, put his arm around her shoulder, and told her, 'Baby, we need to talk,' after she had informed him that she would be instituting a harassment lawsuit.").

    It may be that as a temporary worker, Ms. Sanders thought it would be easier to ask Staffmark to place her at a new job rather than to complain at AGC or to remain silent and wait to see if Mr. Ray's conduct would continue. That decision may be reasonable under the circumstances, but the Court does not understand that the applicable legal standard compels the Court to consider what an objective,

reasonable temporary employee would do if she were in Ms. Sanders's place. Instead, the Court believes that the Eleventh Circuit standard examines a plaintiff's conduct from the perspective of an ordinary employee who must decide between either resigning or staying at her place of employment and addressing the harassing conduct.

Therefore, AGC is entitled to judgment as a matter of law on Ms. Sanders's tangible employment action claim because Ms. Sanders cannot establish that Mr. Ray terminated her employment or that she was constructively discharged. Because Ms. Sanders has not presented sufficient evidence of a tangible employment action, she may prevail on her claim against AGC only if she can establish a hostile work environment claim.

> The second way for sexual harassment to violate Title VII is if it is sufficiently severe and pervasive to effectively result in a change (sometimes referred to as a constructive change) in the terms and conditions of employment, even though the employee is not discharged, demoted, or reassigned. This is hostile work environment harassment. *See id.* at 754, 118 S.Ct. at 2265. The supervisor does not have to be the harasser for this kind of sexual harassment to occur, although experience has proven that he often will be. Regardless of who is the harasser, the employer may be able to escape liability for a hostile environment by establishing as an affirmative defense that the employee failed to take prompt advantage of the employer's system for reporting and preventing harassment. *Faragher v. City of Boca Raton,* 524 U.S. 775, 807–08, 118 S.Ct. 2275, 2293, 141 L.Ed.2d 662 (1998); *Ellerth,* 524 U.S. at 765, 118 S.Ct. at 2270. In that respect hostile work environment harassment is different from tangible employment action harassment.

*Hulsey*, 367 F.3d at 1245.

Ms. Sanders's failure to promptly notify AGC of Mr. Ray's alleged harassing conduct is fatal to her hostile work environment claim. It is undisputed that Ms. Sanders did not complain about the text message or any of the other alleged harassing behavior until the day she walked off of her job at AGC, even though Mr. Ray had been harassing her for weeks. "The *Faragher* and *Ellerth* decisions present employees who are victims of harassment with a hard choice: assist in the prevention of harassment by promptly reporting it to the employer, or lose the opportunity to successfully prosecute a Title VII claim based on the harassment." *Baldwin v. Blue Cross/Blue Shield of Alabama*, 480 F.3d 1287, 1307 (11th Cir. 2007);[6] *see also Walton v. Johnson & Johnson Servs., Inc.*, 347 F.3d 1272, 1290 (11th Cir. 2003) (finding employer satisfied second element of affirmative defense where employee failed to complain when the alleged harassment initially began and thereby failed to give the employer "an opportunity to address the situation and prevent further harm from occurring").[7]

The record establishes that Ms. Sanders was on notice that she had to act promptly to address harassing conduct. Ms. Sanders received a copy of

---

[6] *See Faragher v. City of Boca Raton*, 524 U.S. 775 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998).

[7] Ms. Sanders contends that before she left AGC on October 24, 2010, she told Mr. Reed, an AGC On-Site Manager, that Terrance Harris put his hands in her back pockets. (Doc. 19-2, p. 1). Ms. Sanders's complaint to Mr. Reed occurred contemporaneously with or hours after Ms. Sanders's departure from AGC. The complaint came too late.

Staffmark's anti-harassment/non-discrimination policy when she joined Staffmark. (Doc. 19-2, p. 22-23; 19-4, pp. 2-3).[8]  The policy defines sexual harassment and provides examples of it.  (Doc. 19-4, p. 2).  The policy also states that employees must provide notice of harassing conduct immediately and "must take an active role in stopping the harassment."  (Doc. 19-4, p. 2).  The policy provides:

What should I do if I am harassed?

- First and foremost, tell the person to stop the unwanted behavior, and that if they don't, you will notify your Staffmark Account Manager, On-Site Manager or Staffmark Human Resources.  You must take an active role in stopping the harassment.

- If the person harassing you is your supervisor, contact your Staffmark Account Manager, On-Site Manager or Staffmark Human Resources (telephone (866) 765-7544)).

- Notify your Staffmark Account Manager, On-Site Manager or Staffmark Human Resources (telephone (866) 765-7544)) immediately.

(Doc. 19-4, p. 2).  Thus, the policy reasonably notified Ms. Sanders of the way to report alleged harassment to AGC and offered Ms. Sanders the alternative of

---

[8] Ms. Sanders alleged, and AGC admitted for summary judgment purposes, that Staffmark and AGC were joint employers.  The parties stipulated during the June 11, 2014 hearing that Staffmark, not AGC, issued Ms. Sanders's paychecks.  An employer establishes the first element of the *Faragher-Ellerth* affirmative defense when the employer demonstrates that it took reasonable care to prevent sexual harassment by disseminating a sexual harassment policy with reasonable complaint procedures.  *Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1314 (11th Cir. 2001) (to meet its burden of demonstrating an employer took reasonable care to prevent harassment, the employer must show "that its sexual harassment policy was effectively published, that it contained reasonable complaint procedures, and that it contained no other fatal defect").

contacting her Staffmark Account Manager or the Staffmark human resources department.  As a result, AGC, as a joint employer with Staffmark, took reasonable care to prevent harassment.  *Madray v. Publix Supermarkets, Inc.*, 208 F.3d 1290, 1289-90 (finding the employer's sexual harassment policy reasonable because it contained "multiple avenues for lodging a sexual harassment complaint outside the supervisory chain of command").[9]

      Because AGC has established both elements of the *Faragher-Ellerth* defense, the Court finds that AGC is entitled to judgment as a matter of law on Ms. Sanders's hostile work environment claim.

---

[9] The record reflects that AGC had a separate sexual harassment policy, but Ms. Sanders did not receive a copy of it. (Doc. 19-1, p. 23; Doc. 19-16, ¶ 5). Because Ms. Sanders stipulated that AGC and Staffmark were her joint employers, the Staffmark policy is adequate for purposes of establishing the *Faragher-Ellerth* affirmative defense. Ms. Sanders complains that AGC did not take adequate steps to investigate her complaints about Mr. Ray and Mr. Harris. The point is moot because she waited too long to notify either AGC or Staffmark of the conduct that caused Ms. Sanders to leave AGC and ask Staffmark to place her in a new job. Nevertheless, Ms. Sanders's criticisms of AGC's investigation are well-taken. When AGC interviewed Mr. Ray, he denied Ms. Sanders's allegations. AGC easily could have asked Mr. Ray for his cell phone number to determine whether he sent the text message that prompted Ms. Sanders to leave AGC, but the company accepted Mr. Ray's response at face value. AGC learned that Mr. Ray lied during the company's internal investigation only after Mr. Ray admitted during his deposition that he sent Ms. Sanders the text message. (Doc. 19-9, p. 11; Doc. 19-16, ¶ 7). Although the Eleventh Circuit does not require a perfect investigation, the employer's investigation of sexual harassment allegations must be reasonable under the circumstances. Of course, hindsight is 20-20, but it appears to the Court that there are reasonable steps that AGC could have taken as part of its internal investigation to determine whether Mr. Ray sent Ms. Sanders a text message containing a photograph of his penis.

**CONCLUSION**

For the reasons outlined above, AGC is entitled to summary judgment on Ms. Sanders's sexual harassment claim. The Court asks the Clerk to please TERM Doc. 17. The Court will enter a separate final judgment.

**DONE** and **ORDERED** this 29th day of July, 2014.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE